UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| ELLA W.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 1:21cv122 |
| | ) | |
| KILOLO  KIJAKAZI, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Section 205(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.  The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of no less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment

_____

[1] For privacy purposes, Plaintiff's full name will not be used in this Order.

is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3).  It is not enough for a plaintiff to establish that an impairment exists.  It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity.  *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979).  It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff.  *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings."  *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g).  "Substantial evidence is defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977).  "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law."  *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after a hearing, the Administrative Law Judge ("ALJ") made the following findings:

1. The claimant has not engaged in substantial gainful activity (SGA) since January 23, 2019, the SSI application date (20 CFR 416.971 *et seq.*).

2.      The claimant has the following severe impairments: obesity, migraines/vertigo (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can stand or walk for two hours and sit for six hours out of an eight-hour workday. She can occasionally climb stairs or ramps, balance, kneel, crawl, stoop, or crouch, but can never climb ladders, ropes, or scaffolds. The claimant can frequently handle and finger with right, dominant, upper extremity. The claimant must avoid concentrated exposure to wetness, moving machinery, and unprotected heights. Work with a moderate level of noise. Work with an option to sit or stand, changing positions no more frequently than every 30 minutes, while remaining on task.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on June 17, 1976, and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.      The claimant has at least a high school education (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since January 23, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 22-35).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to benefits, leading to the present appeal.

3

Plaintiff filed her opening brief on January 14, 2022.  On March 25, 2022 the defendant filed a memorandum in support of the Commissioner's decision to which Plaintiff replied on April 28, 2022. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled.  *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987).  The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order:  (1)  Is the claimant presently unemployed?  (2)  Is the claimant's impairment "severe"?  (3)  Does the impairment meet or exceed one of a list of specific impairments?  (4)  Is the claimant unable to perform his or her former occupation?  (5)  Is the claimant unable to perform any other work within the economy?  An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).   In the present case, Step 5 was the determinative inquiry.

Plaintiff was born on June 17, 1976 and was 42 years old on her application filing date. (Tr. 33). She has at least a high school education. She has past relevant work as an office clerk. (*Id*.).

Plaintiff saw family medicine nurse practitioner Abby Levitz on July 9, 2018 to address problems including scattered pain, fatigue, and headaches. (Tr. 408-09). She said her headaches

4

began about four months prior, typically lasting 30 minutes to an hour before she had relief from
ibuprofen and occurring one to two times per week. (Tr. 409). They did not seem related to any
time of the day, and they were usually dull and located on the top of her head. She said her most
severe headaches were at a five of ten in intensity. They had been increasing in frequency more
recently. (*Id*.) A brain MRI on July 24, 2018 showed a small amount of fluid in the optic nerve
sheaths with a partially empty sella and mild bilateral maxillary sinus disease. (Tr. 420).

      Plaintiff returned to Ms. Levitz on August 3, 2018 to address bilateral hand and ankle
pain. (Tr. 411). Ms. Levitz noted bony tenderness in Plaintiff's second and third "MIP" (perhaps
metacarpophalangeal, or MCP) joints, the fifth proximal interphalangeal (PIP) joints of the right
hand, and the second and third PIP joints of the left hand; swelling in the second PIP joint of the
left hand; decreased strength in both hands; and decreased range of motion in both feet with bony
tenderness of the posterior heel of the right foot. (Tr. 412). X-rays of the hands on that date
showed second, third, and fourth joint edema in the right hand and possible sequela of a prior
injury in the third digit of the left hand. (Tr. 341-42). X-rays of the feet showed mild
enthesopathic changes at the Achilles tendon insertion sites of both feet. (Tr. 343).

      On August 8, 2018, Plaintiff established care with rheumatologist Dr. Steven Ko,
complaining of joint pain and swelling with a significant rheumatoid factor and anti-CCP
positivity. (Tr. 289). Dr. Ko observed moderate tenderness and decreased range of motion in the
right shoulder, mild tenderness at the bicipital groove, small nodules in the elbows, moderate
tenderness at the wrists with decreased flexion, mild to moderate synovitis of the right second
and third MCP joints with minimal tenderness, trace synovitis of the second through fourth PIP
joints with minimal tenderness bilaterally, and tenderness of the right third metacarpophalangeal

(MTP) joint. (Tr. 291). Dr. Ko diagnosed "new onset of polyarticular rheumatoid arthritis in the setting of seropositive anti-CCP positive polyarticular presentation on somebody who is smoking chronically," which he noted was "probably [the] most aggressive rheumatoid arthritis one could find from [a] risk stratification standpoint." (Tr. 292). He discontinued meloxicam because it was giving incomplete control despite already being at the maximum dose; he started prednisone, methotrexate, and leucovorin. (*Id*.)

Plaintiff then established care with rheumatologist Natali Balog on January 17, 2019. (Tr. 448). Plaintiff said that the methotrexate prescribed by Dr. Ko had caused vomiting. (Tr. 449). She continued to experience joint pain and swelling, which was helped by ongoing prednisone use. (*Id*.) On examination, Dr. Balog noted a "mild bogginess" in the MCP and PIP joints that was greater on the right and additional "mild bogginess" in the wrists. (Tr. 450). She also recorded a BMI of 42.01 for Plaintiff. (*Id*.) Dr. Balog started Plaintiff on Arava and a tapering dose of prednisone. (Tr. 448). She also ordered x-rays to address Plaintiff's complaint of low back pain, which Dr. Balog noted would not be due to rheumatoid arthritis. (*Id*.) X-rays showed minimal L5-S1 degenerative disc disease with disc space narrowing, as well as tiny endplate osteophytes from L3-4 through L4-5. (Tr. 453). At follow-up on February 19, 2019, Plaintiff reported new right shoulder pain. (Tr. 465). Physical examination demonstrated positive impingement in the right shoulder. (*Id*.) Plaintiff returned to Dr. Balog on March 4, 2019; Dr. Balog added Humira to the medication regimen at that time. (Tr. 460). She also strongly urged regular physical therapy and aggressive weight loss to address Plaintiff's back and shoulder pain. (*Id*.) Plaintiff participated in physical therapy over seven visits between February and April of 2019, with five cancellations or no-shows. (Tr. 527-28). While she did not experience a sufficient

6

decrease in the tingling and numbness in her right upper extremity or a decrease in her lower back pain enough to ease her activities of daily living, she was discharged because she was competent with a home exercise program as assigned. (Tr. 528). By the next visit to Dr. Balog on June 13, 2019, Plaintiff reported some improvement with the medication regimen. (Tr. 482). She followed up with Dr. Balog most recently in the record on September 4, 2019. (Tr. 606). Rheumatologist Brent Mohr began to treat Plaintiff's rheumatoid arthritis in October 2019. (Tr. 611). With some medication changes, Plaintiff was tolerating her medications better by January 2020. (Tr. 616). However, the only records from Dr. Mohr are poor copies and are difficult to read.

Plaintiff saw Ms. Levitz on September 13, 2019 for a dull ache in her left eye with associated symptoms of blurred and double vision, itching, nausea, and photophobia. (Tr. 568). The onset was just an hour and a half before the visit, and she was improving by the time of the examination. (*Id*.) A review of systems was positive for dizziness and headaches with a history of migraines. (Tr. 569). Ms. Levitz noted that Plaintiff experienced vertigo with changing positions from sitting up and lying down on the exam table and with rotating her head left to right while lying down, although the vertigo would resolve after several seconds. She still had minimal blurred vision during the exam, and she had to shut her right eye periodically, as that seemed to moderately help alleviate the vertigo and blurriness. Ms. Levitz assessed vertiginous migraine and provided a butorphanol and promethazine injection. (*Id*.) Plaintiff returned to the office four days later to see family medicine physician Dr. Daryl Hershberger due to another headache. (Tr. 570). She had taken Tylenol before the visit. She said that the previous injection had improved her symptoms after the last visit. She said she also had issues with arm jerking and was unable to grasp a glass or move her arm with purpose. (*Id*.) Dr. Hershberger assessed double vision,

migraine, and seizure-like activity. (Tr. 571). He recommended an EEG. (*Id*.) The EEG was normal, and Dr. Hershberger discussed the results with Plaintiff on October 11, 2019. (Tr. 572). As Plaintiff continued to have fatigue, weakness, headaches, and vertigo with nausea and eye watering, Dr. Hershberger referred her to neurology. (*Id*.)

Plaintiff saw neurology nurse practitioner Vivian Appiarius on November 8, 2019. (Tr. 575). At this visit, Plaintiff described an incident in September 2019 in which she was driving and "felt that her legs did not want to move," and her vision became blurry such that she could see shapes only. "When closing one eye, she felt the road was moving under the car, felt as if everything was moving around her." She also had a severe, throbbing headache at a ten of ten in intensity, located behind the left eye and left temporal and associated with nausea, vomiting, and sensitivity to light, noise, and smell. She said that she had daily moderate headaches at an intensity of two, as well as migraines in the past without treatment. Her activity was "debilitated" with headaches (presumably the migraine headaches, although unspecified in the notes). (*Id*.) A review of systems was positive for malaise, fatigue, blurred vision, double vision, nausea, muscle and joint pains, a history of falls, headaches, easy bleeding or bruising, and insomnia. (Tr. 576). Ms. Appiarius assessed migraines. (Tr. 578). Since the vision changes had so far been associated only with severe headache at the time, she believed they were symptoms of migraines. She considered starting Plaintiff on a triptan. (*Id*.)

Plaintiff followed up with Ms. Appiarius on December 30, 2019. (Tr. 579). Plaintiff was taking daily over-the-counter medications no more than two days per week and was no longer having constant headaches. (Tr. 580). She took Imitrex for migraines but got very tired and did not like how it made her feel dysfunctional, although it did help with the headache. She had three

migraines in the past month and two to three mild headaches a week. She also now reported vertigo episodes even outside of the context of headaches, occurring about two times per month. (*Id.*) Ms. Appiarius started Plaintiff on daily Topamax and encouraged the use of a half dose of Imitrex for her headaches to see if it did not make her too tired. (Tr. 583). They also discussed possibly switching to Maxalt. (*Id.*)

Plaintiff again followed up with Ms. Appiarius, this time by video, on March 23, 2020. (Tr. 588). She said that a half-dose of Imitrex was helpful. (Tr. 589). She reported three migraines in the past month and two to three mild headaches a week. (*Id.*)

In support of remand, Plaintiff first argues that the ALJ failed to account for relevant limitations associated with Plaintiff's migraines and vertigo. The ALJ only identified three severe impairments: obesity, migraines, and vertigo. (Tr. 22). Nonetheless, the ALJ accounted for limitations resulting from rheumatoid arthritis in her final assessment of Plaintiff's residual functional capacity (RFC). (Tr. 22, 24). The RFC is largely reflective of limitations provided by the non-examining state agency consultant on reconsideration, who explicitly provided limitations for inflammatory arthritis and a dysfunction of at least one major joint. (Tr. 24, 97, 99-100). The consultant opined that Plaintiff was limited to light work with only two hours of standing or walking total in an eight-hour workday; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; frequent handling and fingering of the right upper extremity; and avoidance of concentrated exposure to wetness and noise. (Tr. 99-100). The limitation to avoidance of concentrated exposure to noise appears to be based on the development on reconsideration that Plaintiff was "now having headaches." (Tr. 102). The ALJ apparently adapted the noise limitation to allow for "a moderate

level of noise." (Tr. 24). Other than that, the only additional limitations that the ALJ provided relate to avoidance of concentrated exposure to moving machinery and unprotected heights, as well as a sit/stand option in which Plaintiff would remain on task. (*Id*.)

Plaintiff's statements in treating records and at the hearing indicate that she has about three to four migraine headaches a month in addition to daily or twice-to-thrice weekly headaches. (Tr. 576, 580, 589, 65-66). Additional statements in treatment notes and the hearing testimony suggest two to three separate episodes of vertigo a month. (Tr. 66-67, 580). At the hearing, Plaintiff testified that her migraines required her to lie down in a dark room, that her medications to address migraines caused her to sleep five or six hours, and that her vertigo symptoms could last three to four hours when present. (Tr. 65-67). She stated that while loud noise or flashing lights could trigger a migraine, most of her migraine headaches occurred without any apparent trigger and without any predictable time of day. (Tr. 56). All of these statements and the relevant migraine treatment are from after the most recent review by a non-examining state agency consultant, so they could not have been considered by the consultant. Additionally, Plaintiff exhibited behavior suggestive of active vertigo/headache symptoms during a primary care exam in September 2019— after the last consultant review. (Tr. 569).

Plaintiff argues that while it would be reasonable for an individual with migraines and vertigo to avoid loud noise, moving machinery, and unprotected heights, these limitations alone do not adequately address the actual presentation of Plaintiff's severe migraines or vertigo. Plaintiff notes that, even only accounting for those migraines caused by a clear trigger, it is unclear why the ALJ accounted for loud noises but not flashing lights. However, the vast majority of Plaintiff's migraines do not have a clear trigger and require her to lie down in a dark room

10

during their course. She has these migraines about three days a month. She has about another three days of separate vertigo episodes, and her presentation of vertigo behavior in the exam room would suggest that any small movement could be fairly debilitating for her. Plaintiff contends that it is not realistic that an individual could perform any work-like activity while experiencing one of these migraine or vertigo episodes. The ALJ's sit/stand option while remaining on task would not help someone with a migraine or vertigo, and the transition movements would likely make the vertigo worse. At the hearing, the VE testified that employers tolerated no more than 10% of time off task and no more than one day a month of arriving late or leaving early by about an hour or missing the whole day. (Tr. 74-75). Plaintiff argues that, given the frequency of her migraine and vertigo episodes, a proper accounting for the resultant time off task and absences would have warranted a finding of disability.

The ALJ's RFC in the present case appears to address some of the most obvious instances in which it would be unsafe to develop vertigo; she also modified the state agency consultant's noise limitation apparently meant to address headaches, rather than the migraines now indicated in the record that persist despite adherence to treatment provided by a neurologist. The ALJ did not account for migraines and vertigo as they affected Plaintiff, demonstrated by the medical evidence and Plaintiff's own testimony.

In response, the Commissioner misconstrues the record. The Commissioner points out that sometimes there are triggers that cause Plaintiff's migraines. However, the Commissioner's suggestion that these are the only things that trigger Plaintiff's migraine is not well-taken. Plaintiff testified that while she avoided triggers of loud noise and flashing lights, she stayed home most of the time and did not know what triggered most of her migraines. (Tr. 56). Early on

in her efforts to seek migraine relief, Plaintiff told her family nurse practitioner that her headaches did not seem related to time of day and were increasing in frequency.  (Tr. 409). In both December 2019 and March 2020, Plaintiff told her neurology nurse practitioner that she had three migraines in the month prior to each visit. (Tr. 580, 588). The ALJ accepted that migraines represented a severe impairment, and it is unclear why the ALJ did not provide limitations reflecting the symptom intensity and frequency reported by Plaintiff in the hearing and in treatment notes.

Thus, remand is required on this issue.  On remand the ALJ must, in the RFC, account for Plaintiff's migraines and vertigo.

Plaintiff also contends that the ALJ erred in assessing Plaintiff's credibility. At step one, the ALJ found no ongoing substantial gainful activity but nonetheless remarked that while Plaintiff admitted to unreported work that ended in 2018, "her testimony indicates, in fact, these payments continue despite her assertions of performing no work activity." (Tr. 22). The ALJ decided that "such reports and testimony by the claimant do not reasonably enhance the persuasiveness for a finding this younger individual is now totally disabled and unable to engage in any type of basic gainful work activity." *Id*. This is a mischaracterization of Plaintiff's testimony. Plaintiff testified that she worked full-time until about 2017 and then continued to work part-time until December 2018. (Tr. 47-48). She said that she was compensated for her work by her children's father, who paid her bills. (Tr. 51). She said that he still paid for her bills even though she is not working for him. (Tr. 52). This whole payment arrangement and work situation does not resemble a typical work environment and in fact suggests subsidized work for the period in which she was still working at all. "An employer may, because of a benevolent

12

attitude toward a handicapped individual, subsidize the employee's earnings by paying more in wages than the reasonable value of the actual services performed. When this occurs, the excess will be regarded as a subsidy rather than earnings." SSR 83-33. Plaintiff's characterization of her past work suggests that she owed her job to her children's father, who did not compensate her traditionally but instead simply paid for all the needs of Plaintiff and their children. Even when she went to part-time work and eventually stopped working, he continued to provide the same level of care. This both explains why the work was unreported—she wasn't exactly treated like an employee—and why her children's father, rather than a dispassionate business owner, would continue to pay for her lifestyle even while she was not working. The ALJ did not provide any inquiry to determine whether this represented subsidized work. Rather, the ALJ opted to describe the payments of Plaintiff's children's father as that of an employer paying a salary that inexplicably continued beyond the alleged termination of employment. Of course, payments that are made where one is not actually doing any work in exchange would not meet the definition of substantial gainful activity, anymore than any other non-working claimant who is supported by a family member.

Throughout her decision, the ALJ appears to offer three citations in support of her allegation of ongoing work activity: Exhibit 5F at page 26 (Tr. 426), Exhibit 11F at page 1 (Tr. 562), and Exhibit 8F at page 26 (Tr. 502). The first example is in fact a report on the results of an August 2018 abdominal CT scan and has no relevance to the discussion. (Tr. 426). The second example is a face sheet with insurance information from March 25, 2020 that says her employer is B&S Auto Salvage and that her status is full-time, without any further details. (Tr. 562). As this was not information clearly provided by Plaintiff contemporaneously, this appears to be outdated

information from the healthcare provider or insurer, rather than an affirmation of ongoing full-time work. The final example is from a history form completed by Plaintiff on March 4, 2019 (Tr. 503) in which she said she was working as a "secretary/office manager" for 20 to 30 hours a week on average. (Tr. 502). This is a clear reference to ongoing part-time work at least as of March 2019. The owner of the company, the father of Plaintiff's children, continues to pay for her lifestyle, so Plaintiff does not disagree that she is still receiving payments. A history form completed three months after Plaintiff recalled last working could indicate that Plaintiff mis-remembered by a few months, or that she still intended to return to work at the time of completing the form. The ALJ could have sought clarification from Plaintiff. Furthermore, if the ALJ believed that this indicated that Plaintiff did not have severe impairments of migraines and vertigo, then she should have addressed that directly. She cannot find severe impairments and then decide to not provide relevant limitations because she suspected, with the most threadbare of evidence, that Plaintiff was secretly still working.

Remand is required on this issue so that the ALJ has the opportunity to obtain additional testimony from Plaintiff to clarify details of her work history, to address questions related to subsidized work, and to confirm the presence or absence of any ongoing work.

Next, Plaintiff argues that the ALJ did not seriously consider Listing 11.02 and did not consider Listing 14.09 at all. Plaintiff contends that the ALJ's reliance on a prior, non-examining, consultant review to determine that a Listing was not met or medically equaled was insufficient because relevant evidence supporting such a finding was not available until after those consultants' review.

As noted, the ALJ agreed that Plaintiff had a severe impairment of migraine headaches.

14

(Tr. 22). While there is not a specific listed impairment for migraines, the agency recognizes

epilepsy as the most closely analogous listed impairment for a medically determinable

impairment of a primary headache disorder, and thus Listing 11.02 should be considered with

migraines. SSR 19- 4p. The policy interpretation ruling that suggests the use of Listing 11.02 also

provides standards to be used when considering migraines under this listed impairment. *Id*. The

ALJ recognized that chronic migraines can be considered under Listing 11.02. (Tr. 23). However,

her entire discussion of migraines under that Listing is as follows:

> The evidence does not support a frequency of migraines occurring at least once a
> month for at least three consecutive months despite adherence to prescribed
> treatment (i.e. see 11.00C). Nor migraines occurring at least once a week for at
> least three consecutive months despite adherence to prescribed treatment. Nor
> generalized migraines occurring at least once every two months for at least four
> consecutive months despite adherence to prescribed treatment and a marked
> limitation in one of the following. 1) Physical functioning (i.e. see 11.00G3a) or;
> 2) Understanding, remembering or applying information or; 3) Interacting with
> others or; 4) Concentrating, persisting or maintaining pace or: 5) Adapting or
> managing oneself. Nor migraines occurring at least once every two weeks for at
> least three consecutive months despite adherence to prescribed treatment and a
> marked limitation in one of the five aforementioned areas of functioning.

(Tr. 23-24). As Plaintiff points out, this evaluation is little more than a recitation of the Listing

requirements for seizures, substituting "migraines" in the place of seizures, and simply stating

that none of the requirements are met. However, the ALJ recognized that Plaintiff had a severe

impairment of migraines, and Plaintiff's testimony regarding migraines at the hearing is

consistent with her statements to her neurologist in the available treatment notes. At her first

neurology visit, she reported daily moderate headaches and a history of migraines. (Tr. 576). At

her next two visits, she reported three migraines monthly and two to three mild headaches

weekly. (Tr. 580, 589). At the hearing, she testified that she had three to four migraines monthly

and was once more having daily mild headaches. (Tr. 65-66). The ALJ's discussion of Listing

15

11.02 is factually wrong and does not offer any explanation as to why Plaintiff's documented history of monthly—nearly weekly—migraines should be discounted.

The ALJ could not have relied on the non-examining consultants' failure to find that a Listing was met or medically equaled. While Plaintiff saw her primary care provider for worsening headaches in July 2018, her worst headaches at that time were only five of ten in intensity. (Tr. 408-09). While they were increasing in frequency, she gained relief from ibuprofen and had the headaches one to two times per week. (Tr. 409). These headaches did not resemble typical migraine headaches, she did not pursue specialist treatment for headaches at that time, and their characterization matches that of the mild to moderate headaches she currently experiences between two and seven days a week. In contrast, Plaintiff sought treatment for dizziness and headaches from her primary care provider, noting a history of migraines, in September 2019; she was provided an injection for vertiginous migraine, and this led to the first neurology visit in November 2019. (Tr. 568-69, 575). The most recent non-examining consultant review was in July 2019, thus preceding the development of symptom reporting and treatment for migraine headaches.

In response, the Commissioner argues that there is no detailed description of a typical headache event from an acceptable medical source so the Listing could not be met. However, Plaintiff's neurology nurse practitioner recorded a detailed description of a typical headache event: "throbbing, 10/10 located behind the left eye and left temporal with light, noise and smell sensitivity, nausea and vomiting . . . . She just goes to bed and cry. Moderate headaches occur daily 2/10, dull, no associated symptoms." (Tr. 575). This is a detailed description. The ALJ already recognized that migraine disorder was a medically determinable impairment so clearly

found sufficient evidence to establish that fact in finding Plaintiff's migraine disorder to be a severe impairment. The "detailed description" for purposes of the Listings can include the following:

> [A]ll associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id*.

An acceptable medical source would only be able to observe a patient during scheduled appointments, so of necessity a detailed description that includes frequency and limitations in functioning such as needing to lie down in a dark room would be reliant on subjective statements, not on observations in the exam room. The fact that Plaintiff reported the frequency does not make the report inherently unreliable.

This Court finds that remand is warranted so that the ALJ can properly and fully consider whether Plaintiff meets or medically equals Listing 11.02.

With respect to Listing 14.09, Plaintiff correctly points out that the ALJ did not address Listing 14.09 at all. (Tr. 23-24). In fact, the ALJ did not even find rheumatoid arthritis to be a severe impairment. (Tr. 22). The ALJ stated that Plaintiff only had "non-sustained hand findings/ complaints." (Tr. 22). This is contrary to the recurrent positive findings in Plaintiff's hands noted in primary care and rheumatology visits. (Tr. 291, 412, 450). It also is irreconcilable with the original treating rheumatologist's opinion that Plaintiff's presentation of rheumatoid arthritis represented perhaps the most aggressive type that one could find. (Tr. 292). The ALJ also

17

remarked, "The claimant acknowledges her rheumatologist indicated he does not want her taking anything stronger than over-the-counter medications for her alleged rheumatoid pain, which was due to concern for narcotic addiction." (Tr. 23). However, Plaintiff had been taking prescribed medications to address her rheumatoid arthritis since her first rheumatology consultation. The absence of narcotics (which are not anti-inflammatories) is not surprising or indicative of a non-severe impairment. The ALJ ultimately sidestepped the issue by providing limitations for rheumatoid arthritis in her RFC assessment that were in line with limitations provided by a state agency consultant who actually had considered Plaintiff's inflammatory arthritis to be a severe impairment. (Tr. 22-23, 24, 97, 99-100). While this makes the ALJ's step two error harmless, it also enabled the ALJ to recognize rheumatoid arthritis implicitly as a severe impairment without having to look too closely at it under the step three Listings.

Dr. J. Sands, the state agency consultant on reconsideration who recognized that inflammatory arthritis was a severe impairment, explicitly noted that he had considered Listing 14.09 for inflammatory arthritis, along with Listings 1.02 and 1.04 for musculoskeletal disorders, in July 2019. (Tr. 98, 102). He noted symptoms of pain, weakness, and fatigue. (Tr. 98). His report does not spell out how exactly he considered Listing 14.09, but Plaintiff contends that Dr. Sands failed to find that the Listing was met or medically equaled because the evidence to make that determination was only available after his date of review.

Rheumatoid arthritis is an inflammatory arthritis involving the peripheral joints and therefore appropriate to consider under Listing 14.09. 20 CFR 404, Subpart P, Appendix 1, § 14.00 (D) (6) (c). There are four different standards under which Listing 14.09 can be met. *Id.* at § 14.09 (A) – (D). Under the second standard, inflammatory arthritis must be present with

inflammation or deformity in one or more major joints of an upper or a lower extremity with:

> (1) Involvement of two or more organs/body systems with one of the organs/body
>       systems involved to at least a moderate level of severity; and
> (2) At least two of the constitutional symptoms or signs (severe fatigue, fever,
>       malaise, or involuntary weight loss).

*Id*. at § 14.09 (B). "Major joints of an upper or a lower extremity," or "major peripheral joints,"

include the hip, knee, shoulder, elbow, wrist-hand, and ankle-foot, as opposed to other peripheral

joints like the hand or forefoot. *Id*. at §§ 1.00 (F), 14.00 (C) (8). "The wrist and hand are

considered together as one major joint, as are the ankle and foot." *Id*. at § 1.00 (F). The phrase

"organs/body systems" does not appear to be generally defined under the immune system

disorder listings, but when discussing lupus, the following organs or body systems are listed:

"[r]espiratory (pleuritis, pneumonitis), cardiovascular (endocarditis, myocarditis, pericarditis,

vasculitis), renal (glomerulonephritis), hematologic (anemia, leukopenia, thrombocytopenia),

skin (photosensitivity), neurologic (seizures), mental (anxiety, fluctuating cognition ("lupus

fog"), mood disorders, organic brain syndrome, psychosis), or immune system disorders

(inflammatory arthritis)." *Id*. at § 14.00 (D) (a).

   The discussion of evaluation of inflammatory arthritis under the listings also provides its

own list of example body systems: "[m]usculoskeletal (heel enthesopathy), ophthalmologic

(iridocyclitis, keratoconjunctivitis sicca, uveitis), pulmonary (pleuritis, pulmonary fibrosis or

nodules, restrictive lung disease), cardiovascular (aortic valve insufficiency, arrhythmias,

coronary arteritis, myocarditis, pericarditis, Raynaud's phenomenon, systemic vasculitis), renal

(amyloidosis of the kidney), hematologic (chronic anemia, thrombocytopenia), neurologic

(peripheral neuropathy, radiculopathy, spinal cord or cauda equina compression with sensory and

motor loss), mental (cognitive dysfunction, poor memory), and immune system (Felty's syndrome

(hypersplenism with compromised immune competence)). *Id*. at § 14.00 (D) (6) (e) (iii).

At least one of the body systems must be involved to at least a "moderate" degree. While "a moderate level of severity" is not defined in the 14.00 listings, outside of being greater than "no" or "mild" limitation (*Id*. at § 14.00 (I) (5)), a relevant point of comparison would be to the same five-point rating scale used for mental health impairments and defined under Listing 12.00 (F) (2). There, a "moderate" limitation results in a "fair" ability to function in a given area "independently, appropriately, effectively, and on a sustained basis." *Id*. at § 12.00 (F) (2) (c). This is a greater limitation than the "slightly limited" functioning of a mild limitation and a lesser limitation than the "seriously limited" functioning of a marked limitation. *Id*. at § 12.00 (F) (2) (b) – (d). Thus, having limitations severe enough to result in a limitation in one's residual functional capacity would evidence at least a "moderate" limitation. Finally, "[s]evere fatigue means a frequent sense of exhaustion that results in significantly reduced physical activity or mental function. Malaise means frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." *Id*. at § 14.00 (C) (2).

By the time of Dr. Sands' review, Plaintiff had been diagnosed with rheumatoid arthritis. The rheumatoid arthritis clearly caused inflammation in the bilateral wrist-hand joints, with moderate tenderness and decreased range of motion in both wrists as well as synovitis and tenderness in the finger joints present in August 2018, as well as "bogginess" that could be reflective of synovitis with swelling in the wrists and fingers in January 2019. (Tr. 291, 450). Additionally, the major joints of the elbows have a documented deformity, with the presence of small nodules. (Tr. 291). Therefore, the issue is whether Plaintiff had at least two organs or body

20

systems involved to a moderate degree and at least two constitutional symptoms or signs.

Plaintiff's immune system is involved, by nature of her seropositive inflammatory arthritis. (Tr. 292). Plaintiff's neurologic system is involved, as she has vertigo, migraines, and seizure-like symptoms. (Tr. 571). However, seizure-like activity in the context of migraines and vertigo was only addressed in September 2019 (Tr. 570), so Dr. Sands would not necessarily have considered involvement of the neurologic system at the time. Further support for the involvement of the neurologic system is the presence of a positive clinical finding of shoulder impingement on exam—since this has not been developed further, it seems possible that this evidences radiculopathy. (Tr. 465). Additionally, the musculoskeletal system is involved; there is documented evidence of heel enthesopathy. (Tr. 343). Therefore, there is involvement of at least three body systems (immune, neurologic, and musculoskeletal). Furthermore, Plaintiff's inflammatory arthritis and neurologic impairments have both impacted her RFC, as assessed by the ALJ, and therefore they are both impacted to more than a moderate degree.

As for constitutional signs and symptoms, reported fatigue has appeared regularly in treatment notes. (*See, e.g.*,Tr. at 409, 572, 576). Indeed, Dr. Sands noted fatigue as a symptom. (Tr. 98). However, "malaise," even with its regulatory definition in mind, is more difficult to easily identify. However, since Dr. Sands' review, "malaise" has appeared as an explicit constitutional symptom in treating neurology notes. (Tr. 576). Thus, where Dr. Sands could only find one constitutional sign or symptom—fatigue—there are now two with the addition of malaise.

Remand is thus required so that the ALJ can reconsider whether Listing 14.09 is met or medically equaled and provide a proper Step Three analysis.

<u>Conclusion</u>

On the basis of the foregoing, the Decision of the Commissioner is hereby REVERSED

AND REMANDED for further proceedings consistent with this Opinion.


Entered: May 4, 2022.


s/ William C.  Lee
William C. Lee, Judge
United States District Court